Good morning ladies and gentlemen. Our first case for this morning will be Camm against Faith and Mr. Adams, if you're ready. District Court's grant of summary judgment should be reversed for three different reasons. One, probable cause did not exist for David Camm's prosecution. Two, the facts in the opinion were construed in the light most favorable to the defendants violating the summary judgment standard. And three, no reasonable officer could have relied on Stites unqualified opinion for probable cause. As we know when we're looking at probable cause, the officers in the court are looking at the totality of circumstances facing a reasonably prudent officer. We know that the probable cause standard is a loose  Can I ask you, are you focusing right now, this will just be helpful as we go forward, on probable cause for the initial arrest? Because there were several, as we know, several phases of this. So are we talking about the original arrest? We are, Your Honor. I'm actually, the roadmap that I intend to follow this morning is going to start with the first probable cause affidavit, and then I'm going to move to the second probable cause affidavit, and then I'm going to move to the third probable cause affidavit. So officers can't rely on fact without the full context of the circumstances. They cannot close their eyes to additional information, and that's exactly what Detective, Lead Detective Plemons did when he signed the first probable cause affidavit. He admitted in his deposition that he did not review the evidence. He admitted in his deposition that none of the evidence was tested at that point. He signed it within two days of this beginning. And when you look at the district court's opinion, the district court makes three main points when discussing probable cause. The first point that the court made was that there was an opinion of the presence of HVIS, high-velocity impact spatter, that the officers and faith had no reason to doubt it, but they actually did. Well, that's, you know, this is troublesome because, of course, probable cause isn't the sort of thing that resolves an issue. It's something that has you going forward with further proceedings, and there was some blood. As far as I can tell, that was actually the only thing, but there was some blood on Mr. Cam's shirt. There was. There were eight pieces of blood on the front quadrant of his shirt, and David, upon arriving home, after seeing his wife in a pool of blood, he went over to the vehicle, which was a two-door Bronco. He opened up the door, moved the seat forward. His daughter was immediately to his left. He got in the Bronco and moved past Jill when he pulled Bradley out. Those eight pieces of blood of one millimeter size most likely came from a contactor transfer stain when he brushed past Jill's hair. Now, so what I can see for the probable cause for the first arrest, there's the blood. I'm not sure there's anything else that ties this definitively to Mr. Cam. I know they've had some conversation about the wet mop and a cleaning fluid, but I don't know why that would point to Mr. Cam as opposed to anybody else in the world. There was some injury to the daughter, but again, unless we have some presumption that I'm not willing to engage in, that fathers are the most likely abusers, I don't know why that would be. Might be, might not. I mean, one doesn't know. There's not much else other than Stites saying that those spots couldn't have gotten onto the shirt without him being close to a weapon discharging, right? That is correct, and that's where the opinion that it was HVIS, which is the problem, that is a quantum leap from there are eight spots of blood on somebody's shirt, and the fact that it was made by Mr. Stites, who was completely unqualified to even be there. This gentleman only had an economics degree. He had never processed a crime scene before. He lied and said that he was getting a master's and PhD in fluid dynamics at Portland State University in the first trial. Portland State University doesn't have those degrees. He has later admitted that he was not working on those programs. Stan Faith was calling him the professor throughout the entire first trial. He admitted that he wasn't a professor and that Stan Faith actually was the individual that created these false credentials. He testified that he had processed crime scenes for the Department of the Army, Naval Intelligence, CIA, FBI, all of it completely false. He walks into a crime scene with one duty, according to Rodney Engler, that is to take pictures, and within two days, this person that's unqualified to process a crime scene, unqualified to render an opinion on blood pattern analysis or blood spatter or HVIS, is making a finding about eight drops of blood with a magnifying glass, and the individual officers that were there could tell. Niemeyer testified. I knew that he didn't know what he was talking about. Niemeyer at least had the 40-hour blood pattern course. He approached him and asked him a very rudimentary question that if anybody knew anything about blood spatter, he would have provided the answer. The answer was wrong. This gentleman was wearing gloves. He was contaminating the evidence, not to mention the phenolphthalein that he was spraying on everything that was actually destroying the evidence. He said that he found HVIS on the garage, the shower curtain, and multiple other places when it was not even blood. Yeah, I mean there are obviously a huge number of problems. Let me ask you this in theory. He's arrested, Mr. David Cam is arrested October 1, 2000, and he's acquitted, if I'm getting my dates right, ultimately after the third trial on October 24, 2013. And so is it your sense that he's just in one big long period of time, custody from October 1, 2000 until October 24, 2013? Yes, this was all the continuity or the continuous prosecution. And under Brooks v. Ross, this circuit makes clear that 1983 and Brady claims are most analogous to malicious prosecution claims, which is what we brought our claim here under the Fourth Amendment, because the state of Indiana doesn't have an adequate state law remedy because of their immunity issues. And it does not accrue until the prosecution ends. And this prosecution did not end. If it's a Fourth Amendment claim, the focus is on custody, not prosecution. Well, the custody, he was in custody during this period of time, whether it was actually in the local jail, the Department of Corrections, or on home incarceration for a period of time. He wasn't released until he was acquitted. So whether it's a Fourth Amendment or malicious prosecution claim, you're talking about the same thing. The same date, you're saying? Yes, ma'am. But it's not a malicious prosecution claim. It can only be a Fourth Amendment claim. Brady claims are separate. Brady claims. Sorry, I meant to say the due process. I mean, you've used malicious prosecution, but we know that that terminology is out after Manuel. So the claim having to do with the lack of probable cause in these three probable cause affidavits, those are Fourth Amendment claims, and those attach to the or challenge the custody. And he was out of custody for some period of time, but you've just said he was on house arrest? I did not see that in the... That was my understanding. I don't think that he was ever just free to leave. I don't remember that. He's bailed out. His uncle bails him out January 27, 2005, and then he's back in detention by March 9, 2005. And so the factual question, I would say, is what were the conditions? Frequently, if you're out on bail, you're not just a free person. Maybe you're confined to your house. It's like being on probation or something else. So those are the only days that I can find in this record between October 1, 2000 and October 24, when he's not actually physically incarcerated. But he does seem to be under a restricted status. I don't have the answer to that specific factual question. I will try to find it before my rebuttal time. Okay. As to what restrictions he was under during that period. So you get to the... Because, as Judge Sykes is saying, after Manuel, the courts have been moving around in this. And we had some theories, and other people had some theories. But then the Supreme Court tells us in Manuel that when detention is continued without probable cause, there is a Fourth Amendment claim. And of course, we've issued our understanding of that on remand in the actual Manuel case. So putting the Brady claims off to the side for a moment, that appears to be his theory at this point. And from what I understand, I guess, in the Manuel v. Joliet case, that is before he is processed and after he's processed. Is that correct? Well, right. I mean, in Manuel v. Joliet, even though you've been arraigned, if you're still continued in custody without probable cause, there is a claim that can be stated, obviously. Further proceedings would happen on that claim. But that's the theory. And there is also... We haven't really quite had to consider this, but there's a legal question from our earlier cases that we're looking through the malicious prosecution lens about what it takes to have your claim accrue. When are you finally free of the heck against Humphrey Barr? Because there are cases that say that some kind of intermediate step that's not indicative of innocence isn't good enough. And so you'll look at, you know, if something's been dismissed, Nell Pross, for example, was it on innocence grounds or was it on some other grounds? So there's this huge line of cases that also require that investigation. But anyway, in his case, I understand your argument that at none of these three points you're contending to us was there adequate probable cause to detain him. And that's the Manuel theory. That is correct. So you have no independent malicious prosecution claim here. You have a Fourth Amendment claim for the lack of probable cause for his detention, and then you have your Brady claims. That's correct. And I thought that the malicious prosecution claim was brought through the Fourth Amendment. It used to be in some sense. I can understand why you would think that, but I think the Supreme Court has... Do you have supplemental state claims? I mean, obviously, if there were an Indiana claim that wasn't blocked by immunity. Yeah, there were, but they're not. Yeah, they're gone. Okay. And I was relying on the, I guess, the Julian versus Hannah case. All of that is out the window after Manuel. Okay. What you're left with are your Fourth Amendment claims, as I understand the case, and your Brady claims. And that raises the statute of limitations argument because the Fourth Amendment claims attached to his custody. So, which takes us back to this factual question we've asked you because he does appear to be in continuous custody in the most literal sense with potential question mark over this six week period or so, whatever it is, five or six week period in the middle of 2005. But if he's effectively in custody because he's on bail, then maybe you do have continuous custody. That is my understanding of the facts, but as I stated, I will try to confirm that at the break. Do you want to say anything about your Brady arguments? Sure. that he purported to be in trial one, that the initial prosecutor gave him scientific method pamphlets. But didn't Ham's counsel deliberately forego challenging his qualifications because he thought he was, quote, an idiot and the jury would see that? That was his testimony. He did take his deposition. He did not do any type of daub or challenge of him. He wanted the jury to see him for who he was. But was he, was counsel aware of his lack of qualifications? That's the material point for Brady purposes. He was not. And that didn't come out until many years later. So you're saying his strategic decision not to challenge Stites was not an informed decision because he didn't know what he needed to know about Stites' background? That is correct. He thought that his opinion was preposterous, but he had the initial assumption that he had the credentials, the training and the expertise to do what he did. Did he ask about that in the deposition? I cannot recall specifically in the deposition, but if you recall the testimony from the first trial. No, I know that. I'm just wondering. In a deposition, that would normally come up, right? And so I'm just wondering if Stites lied at the deposition as well as at trial or whether he was able to lie at trial because counsel had an opportunity to ask those questions and simply did not. I do not have his deposition memorized. Most of the witnesses in this case have given seven different statements under oath because there were three trials. Most of them were deposed before each trial. And then in the civil case, when I got to take discovery, it was for the most, in most instances, it was the seventh time these persons went under oath. So I can't remember exactly what he stated in his deposition about his credentials. I mean, that would be a standard way to start a deposition if you're deposing an expert. Where did you go to school? What's your resume? It kind of matters to your claim, right? Because if he knew that in the deposition and then that factored into his decision not to challenge his credentials in front of the jury, then you don't really have a Brady claim, right? If he knew. Right. And I know that he did not know from talking to him, to talking to the first criminal defense attorney. Well, what did he say under oath in his deposition? That's what's important. Not what he said to you in some private conversation. Under oath, he testified that he was not aware of his credentials. He also testified about the other issues with evidence that was supposed to be run under the CODIS system. Those were the two issues. The DNA, yeah. The DNA. The unknown male and female DNA that turned out to be Charles Bonet and Mala Singh, Charles Bonet's girlfriend, who her DNA was at the scene and she's never been charged, and she actually left the United States and went to Trinidad and Tobago immediately after this. That's another unexplained detail, another eyes closing to the evidence that existed in this case. Well, I'm going to alert you, Mr. Adams, that if you want to save a little rebuttal time, you're perilously close to using all of your time. The other Brady evidence is the CODIS information, and we've gotten four different stories from Stan Faith over time as to whether or not he did run it, didn't run it, asked Clemens to run it. Clemens testified nobody on the planet ever asked him to run it, and we know that Charles Bonet's DNA was in the system from 1997 forward. Had they actually run it, it would have come up, Charles Bonet, long before the camp prosecution. And in addition, the last Brady issue is that Spaulding, who was one of the blood spatter analysts that actually had a scientific background that was hired by the prosecution, never testified in the first trial because prior to getting there, he reversed his prior opinion and said that he could not rule out transfer. That was something that Faith never provided that information to McDaniel at all. It's Brady material. He was entitled to know that. He did not find out. Okay. You'll save about a minute. Thank you. And we have several people on the Appelee side, so we begin with Mr. Hudson. May it please the court, David Cam's Fourth Amendment claims are foreclosed by the simple fact that there is far more than probable cause to believe he murdered his wife and two children. The conclusions of the fact finders in his criminal proceedings are instructive. But, you know, why are they instructive? If they are built on a foundation of sand, so to speak, then I don't know. Well, there are a couple of reasons why I have concern about that. First of all, we have to assess probable cause based on the facts available to the police at the time. You can't do it in the light of hindsight. Secondly, looking at your list of things, I'm just now focusing on the first arrest. There's the blood on the shirt. All right. I'll give you that. But as I understand it, the other things were the vaginal tears in the daughter's body, the wet mop in the cleaning, and the fact that he had had affairs with other women. And I don't see anything that points to any individual about those middle two, about the injury to the daughter's body. It could be anyone. I mean, there's nothing, there's no DNA that says, you know, I just find that completely inconclusive. The wet mop gets kind of cut for the trial and the affairs. And then there are timelines all over the block. Some timelines include, you know, perhaps the ability of Star Trek-like to just move from spot to spot. Beam me up, Scotty, you know, from one place to the other. I don't know. It's awfully weak. In addition, Your Honor, to, I mean, there's no question that the high-velocity impact blood spatter is- The eight drops of blood. Well, and it's not just the eight drops of blood, but the expert testimony, or the expert testimony that- Stites? And Rodney Englert's opinion that the blood that was found on the shirt, the description of what the blood looked like- when Englert has never looked at the shirt? Oh, undoubtedly, Your Honor, yes. Why? Because Englert listens to the description of what the blood looks like, and he renders an opinion as to- Over the phone. That's right. And it's not the- Officers are entitled to rely on experts. Do you realize what that sounds like, though? I mean, there are eight drops of blood, and I'm saying, well, I see eight drops of blood on a shirt. What do you think? Is this transferred from hair? Is this high-velocity impact? Is this, you know, something else? Did he cut himself while he was shaving? You know, somebody's going to make that kind of a fine-tuned expert determination without even seeing it? It's not even a video link. I don't think it's unreasonable at all for an officer to believe an expert when the expert says, based on the description of the- Stokes is not an expert. That's right, Your Honor, although- But in any case, Englert hears what a description of what the pattern of blood spots is, and it's reasonable for an officer to rely on Englert when he says, that sounds like that arrived by spatter and not by transfer. That does not sound at all reasonable to me. If he had seen something, I absolutely agree with you that the police are allowed to rely on the expertise of other members of the team, but he doesn't see it. That's right. He just simply hears a description, and I don't think it's at all unreasonable for when an expert holds himself out as someone who is capable of making that opinion for an officer to rely on that. What about counsel's point that the officers on the scene had reason to know that Stites was unqualified and didn't know what he was doing, which would then make their reliance on his opinion less reasonable, right? Only if their opinion of Stites' qualifications also undermines Englert's opinion, the opinion that Englert delivered over the phone. And it's not merely what Niemeyer thought. Niemeyer isn't the only decision maker that's relevant here. It's also Clemens and then ultimately Faith who files the probable cause affidavit. And I think it's worthwhile, even though Chief Judge Wood, you're absolutely correct that we consider whether probable cause existed at the time the affidavit was filed. But I do think that it is instructive to see that there were other experts who saw the same evidence that Stites saw and that was described to Englert over the phone who reached the same conclusion, that it was the result of high-velocity blood spatter. And so that's instructive. It's not conclusive. I don't know why it's instructive, but anyway. So that's it. You get the arrest warrant based on the eight drops of blood. So it's not just that, Your Honor. It's also the timeline, the fact that- The timelines are all over the place. There's one timeline that suggests that the time of death is 7 or 7.30. There's another one that it's 9. If the neighbor heard the sound, he would have had to have gotten back from the basketball game awfully quickly and committed the deed and called the police all within the space of about three minutes, I think. The timelines don't really check out. And to slip away from the basketball theory, basketball game theory is even stranger because that involves getting home, committing the three murders, perhaps changing his clothes. No one says he goes back to the basketball game with blood on himself. I don't know. I mean, he's a fast worker. I don't think it's at all plausible to say that the escape from the basketball game theory is so ridiculous that it destroys probable cause when two juries unanimously bought that theory beyond a reasonable doubt. But these were juries that were tainted by the evidence that the Indiana Court of Appeals said never should have been there. Well, 404B evidence, Your Honor, which, I mean, there was no constitutional problem with that evidence. All we know is that the jury convicted. That's exactly right, Your Honor. And so I'm just saying that's undoubtedly a totality of the evidence assessment on the jury's part. That's what they're told to do. And if they are influenced by things that the Indiana Court of Appeals thinks are serious enough mishaps to require a new trial, Indiana follows harmless error rules. Indiana follows all the normal rules of procedure that you would expect. I'm not sure that the fact that the jury's convicted is terribly probative. That's the whole reason the Indiana Court of Appeals tossed it out. The errors that were made were not harmless. It is, I think, worthwhile to note, however, that the Indiana Supreme Court rejected a sufficiency of the evidence challenge and explicitly held that there was sufficient evidence not merely for probable cause but to... I agree. And I think that's actually quite pertinent to the timeliness of this because if he's in custody the whole time, as we may conclude, then he has never received, until round three, he never received an actual acquittal. All he gets is, we need a redo the first two times. Quite important. That's right, Your Honor. And I think that presents an opportunity to talk about the statute of limitations issue. And here, I think the panel has an accurate understanding of the claims. And the real question here for the statute of limitations issue is whether Mr. Kamm has effectively one Fourth Amendment claim or whether he has multiple Fourth Amendment claims. And similarly with the Brady claims, whether Mr. Kamm has a single Brady claim that pertains to all of his, all of the trials sort of all together as one, or whether he has discrete Brady claims or Brady claim related to the first trial, related to the second trial, related to the third trial. And I think the answer to both of those questions is found in this Court's recent opinion in Johnson v. Winstead. But, you know, Johnson didn't have before it the kind of claim that you are raising. The first trial in Johnson was a trial that was resolved on a different type of ground. And, you know, we made clear there that the Heck Rule did apply in that case to the last trial. But it depends on the theory that's being advanced. Because here's what worries me about your theory. Suppose it is three trials. Suppose it is three claims. So, according to you, he should have filed, let's say, in, let's see, I want to get this right. He's convicted March 17, 2002, and he's incarcerated immediately thereafter. So you think he should have filed a 1983 claim within two years of November 16, 2004 for his first trial. But, of course, by that time he's in the midst of, he's already been convicted now in the second trial. So there's a risk of inconsistent findings on the Brady issues and on the probable cause issues as between the 1983 action pending for the first trial, and then you want him to file a second 1983 action within two years of January 25, 2006, which itself would conflict potentially with what's going on with the third trial. And I think that this may be a be careful what you wish for scenario. If he really has a break in detention, I think that's a different matter. If he's actually out and then he gets re-indicted on some other theory, I would see this quite differently. But one of the concerns about Heck is not having a 1983 action going on at the same time that criminal actions are going on. There could be younger against Harris issues unless he sues in state court. If he does sue in state court and the state removes to federal court, then you would have a different procedural morass. It seems troublesome. Your Honor, those concerns equally apply to the decision in Johnson v. Winstead. Because there were two Miranda claims. A Miranda claim related to the first trial and a Miranda claim related to the second trial. And this court said that the reversal of the second trial immediately made the Miranda claim viable. But the Miranda claim is different. I mean, the facts were complete on the Miranda claim. And I just see this as a different theory from the nature of the actual allegations that we have here. I mean, a Miranda claim renders... As opposed to a Fourth Amendment unlawful detention claim, which just keeps on going until you're not unlawfully detained. And here I think it's worthwhile that it's possible to understand there to be separate claims. Because even if... And it's true that he was out of custody for a brief period of time on bail. But I don't think that's relevant. But he was on bail, right? That's right. I don't think that's relevant. So he had an obligation at any time. His bail could have been revoked. Absolutely. What's relevant, however, is that the authority under which he is detained changes. He is originally detained pursuant to the first probable cause affidavit. After his conviction is reversed, a very short period later, a couple weeks later, a second probable cause affidavit is filed. Why isn't that just like a superseding indictment? We wouldn't say that there was a break in custody just because the government got a superseding indictment. But I think we would say, Your Honor, that if the second probable cause... But the second probable cause affidavit did establish probable cause. Certainly, this court would be capable of saying he's got a claim the first time. Well, couldn't that just relate to damages, though? I mean, it might not affect the statute of limitations. But we might say, well, you know, the first one was faulty. And therefore, he was held in violation of the Fourth Amendment up until the point when then probable cause did exist, maybe at the time that the second affidavit was... That's right, Your Honor. I think it's possible to think of it in the context of damage. But I don't think it's necessary to think about it in the context of damages. It's entirely conceivable to think of there being separate claims. After all, the validity of the probable cause affidavit, the first time you say this probable cause affidavit was insufficient, that's a Fourth Amendment claim. This probable cause affidavit was insufficient, that's a Fourth Amendment claim. And you could think of the Miranda claims in Johnson v. Winstead the same way in terms of damages. But that's not the way this court characterized it. And, in fact, the exact same arguments were made in the rehearing on Bonk petition in Johnson v. Winstead, which this court rejected. Right, but, you know, in Johnson, I just want to say an event where the police are interrogating somebody in violation of their Miranda rights is a closed event. It happens on one day, one afternoon, then it's done, which is why it makes sense to say, and now you need to raise your claim, which we did in Johnson. This unlawful detention situation strikes me as different. Well, two things, Your Honor. First of all, I think there is a very strong connection between a Miranda claim and a Brady claim. Both relate to the validity of the conviction. And both require a 1983 plaintiff to show that, absent a constitutional violation, that they were prejudiced. Both require prejudice, and the prejudice showing could potentially conflict with a criminal conviction. So that's number one. And then number two, I think whether or not it would be perfectly conceivable for a federal jury, in a 1983 case, to conclude that the first probable cause affidavit did not establish probable cause, and that is not inconsistent with a state criminal jury in the second criminal trial looking at different evidence to conclude, beyond a reasonable doubt, that he committed the murder. And that's exactly why this court in Johnson v. Winstead said there are separate claims, and therefore it accrues upon reversal. All right, well, I think we need to let Mr. Tolliver have his say. So thank you very much, Mr. Hudson. Good morning, Your Honors. May it please the Court. Good morning. I'm here on behalf of Robert Stites, a blood spatter expert retained by the state of Indiana. And we would ask that summary judgment. You're still calling him that? Analyst, Your Honor. Good correction. And actually, that would be correct. The standard for expertise in Indiana is relatively low. Does he have knowledge? It's really low. Because actually, I don't know if you've looked at the National Academy of Sciences report 2009 on the use of scientific evidence in courts, but blood spatter evidence is not highly regarded by that rather distinguished and disinterested group. But it is still accepted in Indiana. I understand. I'm not saying that's something. I mean, if it's there, it's there. Mr. Stites couldn't even do that. So even if we assume that Indiana thinks that this is a legitimate form of evidence to bring forth, Mr. Stites at the time of these events was not somebody who knew anything about it. And actually, initially, apparently, is just called in to photograph. Mr. Stites did take photographs. He also examined the scene, took notes, and he was in consultation with Mr. Englert. Mr. Stites' role in this... He had never done a murder scene before, right? Correct. Yeah. So he doesn't... And what does he know about blood, its properties, its viscosity, the way that blood cells function or respond to various stresses? Does he know anything about that at the time? Well, Your Honor, I think you're pointing out the proper remedy for all of this. If there were issues with Mr. Stites' qualification, that's what you would do. There was no movement to disqualify Mr. Stites. Well, look, I mean, you know, the State relies very heavily, as I understood the argument from Mr. Hudson, on Mr. Stites' account of what he was seeing to Mr. Englert over the phone. Mr. Englert never sees anything. I presume Mr. Stites said something like, I see eight little dots of blood on the shirt, or I don't know what words he used. And how Mr. Englert could know what their real size was, whether this was consistent with spatter, whether this was droplets of blood that were transferred some other way, a mystery to me. And, I mean, we had some conversation earlier about a potential pretrial deposition. Can you let us know whether there was a pretrial deposition of Mr. Stites before the first murder trial? I do not know, Your Honor. So you don't know. So we obviously can't tell us whether it's in the record or not, or whether we could get it. What is in the record is that Mr. Stites didn't hide any of this information. No, but as Judge Barrett pointed out, if there were a pretrial deposition of Mr. Stites, and this is a criminal case, so it may not be following the usual pattern that we see in civil litigation, but if there had been, it would be quite interesting to know whether he's asked about his credentials, whether he is honest about those credentials and that deposition, or whether he follows the pattern that he took at the trial. If there's no deposition at all, then we have a different situation, don't we? Yes, Your Honor. But as Judge Barrett pointed out, this information was known to Mr. Kamm's counsel, and because he thought that it was true. No, I didn't say that. I asked if it was known. I said he didn't think he would play well before the jury, but I asked whether he knew about the qualifications. Correct, Your Honor, and I'm sorry about that. And the answer was we don't know. He testified under oath that he did not know about the qualifications before the trial, and we don't have any information about whether there was any pretrial preparation that would have revealed this. Your Honor, what we do know. Suppose the deposition was there and he lies. He says, I'm getting a graduate degree from Portland State University, and I've done this kind of work for years, and Mr. Kamm's counsel says, well, okay, I really don't think the jury is going to make much of this, but I can't really cross-examine him on his credentials. There are a number of options. Mr. Kamm's counsel wouldn't know. Well, there are a number of options that could be done in that case, Your Honor. If you don't know, then maybe exclusion is not the proper approach, but cross-examination is always available, and use of a refuting expert could have been done. Even if you've been lied to by the person. I mean, we all don't. I mean, I know some people lie, but you don't expect the litigation system to work that way. Are you saying that Mr. Kamm's counsel was ineffective because he didn't think Mr. Stites was lying? Your Honor, what I'm saying is that Mr. Stites didn't hide any of this information. Yes, he did. He lied about his credentials. This could have been something that could have been pulled through a CD. It could have been through the pretrial deposition that Your Honor had mentioned earlier. If there was one, which you don't know. Correct. Why does that make a difference if he lied about his credentials? Isn't that necessarily a Brady violation? He's concealing material facts. Your Honor, the law doesn't require you to announce your... If you are unable to... Be careful here. Oh, I'm sorry. I'm sensing where you're going with this, and it sounds like a pretty outrageous position that you're about to take. Well, the position I'm going to take, Your Honor, is that a witness is not required to go up and say, oh, here are all the reasons why you shouldn't believe me. There is no law that... He's acting as an agent of the state, so he has a Brady obligation to disclose material exculpatory facts, and if he is indeed woefully unqualified to give the opinions that he's giving, that's concealment of material exculpatory facts. And that is evidence that could be remedied through either exclusion, cross-examination, or use of your own expertise. But that can only happen if defense counsel is aware of the material exculpatory facts, but they were being concealed by your client and by the prosecutor and by the investigators. And, Your Honor, there is no evidence that Mr. Kemp's counsel believed Mr. Stites. But that doesn't matter. As Judge Stites is saying, he's been deprived of important impeachment evidence, and it's been clear for decades that Brady covers impeachment evidence. That's some of the evidence that's considered exculpatory for the defendant, and counsel has been deprived of that because it's being concealed from him. And partly that was because Mr. Kemp's counsel made a calculated trial strategy to just put him before the jury. He didn't know. Well, okay, I think we've covered this. So we're way over time, but I'm going to balance it back out for Mr. Adams. Thank you, Your Honor. So thank you very much. Mr. Cody. Thank you, Your Honors, and may it please the Court. My name is Chris Cody, and I represent Rodney Englert in this litigation. As a beginning point, there has been no evidence that has been presented in the trial court, nor has there been any argument today as to what Mr. Englert has done to violate Mr. Kemp's Fourth Amendment or Sixth Amendment rights. There is no evidence in this case. The Fourth Amendment right that I understand to have been asserted by Mr. Kemp has been one of fabrication of evidence. Well, what about rendering an opinion based, as Chief Jud Wood was saying earlier, on this kind of over-the-phone rendition of the blood spatter evidence at the crime scene, and then his being willing to render an opinion that that implicated Mr. Kemp when he had reason to know that Stites was completely unqualified to do the examination? That testimony, which has been credited in Mr. Kemp's favor for the summary judgment record, was that Mr. Englert heard what Mr. Stites had to say and said that that sounds like high-velocity impact spatter. There is no evidence that that opinion offered by Mr. Englert was fabricated or intentionally false. As I understand this Court's decisions from the Fields case, which discusses what constitutes fabricated or false testimony, is testimony that is both actually false and known to be false. And there hasn't been any evidence in the record that Mr. Englert believed that at the time that he heard someone else describe what something was and said, yes, it sounds like that. In fact, the complete record on it was that there had been a history of Mr. Stites and Mr. Englert previously investigating another case in Michigan that involved high-velocity impact spatter and that it sounded similar to what that was. So you're saying that, at worst, Mr. Englert was sloppy and didn't really bother to get the facts, but that's not the same thing as concealing, is what I hear you say. Yes, and for purposes of the Fourth Amendment, Your Honor, or the Sixth, that does not constitute a constitutional violation on behalf of my client. There's also evidence that later Mr. Englert did, in fact, go to the scene and personally inspect all of the evidence and then rendered an opinion based upon his own review of all the evidence that occurred both in January and August of 2001. So there's no evidence that Mr. Englert at any time intentionally fabricated or provided any form of false testimony. From a Brady perspective, there's also no evidence that my client failed to disclose or intentionally failed to disclose any form of impeachment evidence or any form of exculpatory information that he knew about. Did he testify at trial? Yes, he did, Your Honor. In all three trials? Yes, Your Honor. And Steitz, his assistant, testified in the first two but not the third. Is that right? I believe that is correct, Your Honor. Yes. And your client was aware of his assistant's lack of qualifications? I don't believe that my client, and I think there's evidence in the record that he was aware of Mr. Steitz's lack of qualifications. He believed, in his own deposition that was given in this case, that he believed that Mr. Steitz was qualified pursuant to the training that he had given him and the education. Did he know his assistant was lying about his qualifications? He did not, and he testified to that in his deposition, that he was unaware that anything that Mr. Steitz had said was false or that he was lying about it at any time. So he thought he was a professor and had all these advanced degrees and et cetera? There's no evidence that he believed that anything that was said was false. So when you refer to his deposition, was that a deposition taken for the present 1983 case or was that a deposition taken at some other time? The deposition I'm referring to, Your Honor, is the one taken for this present case. For this case, okay, so not way back when. Sorry, and there were multiple other depositions taken. One question that the court had asked is whether or not there was a deposition of Mr. Steitz taken prior to the first trial, and that is in the record that there was. I'm sorry that my time is up, Your Honor. I can provide the citation. We can find it if it's in the record. Thank you very much. All right, thank you very much, Mr. Cody. And so, Mr. Adams, because I was giving other people more time, I will give you four minutes. Thank you, Your Honor. Just clarifying a few things. Mr. Steitz did testify in the third trial as well that he was called by the defense because they had figured out that he was a fraud through deposition testimony, through actually subpoenaing his academic records. They knew he wasn't a professor. They knew Portland State did not have those degrees. They hadn't taken any courses. The only science course he ever took, he actually got a failing grade on. And do we know whether his boss was aware of the claims that he was making about his qualifications at the first and second trials? He did not admit to that in his deposition, but this is an individual who Robert Steitz's father was Rodney Englert's best friend. They had known each other for years. They had known each other's families. That's why Mr. Steitz went to work for Mr. Englert. During that entire period of time they're working together, he would have known whether or not he was taking courses, he was a professor, he worked for the Department of the Army, Naval Intelligence, FBI, CIA, or even ever processed a crime scene before. So your position would be that there's at least a factual dispute about his denial of any knowledge? There's a factual dispute, and a jury could make the determination that he was not telling the truth. It's not a credible denial. That is correct. And he too is acting as an agent for the state, and if there's a reasonable inference that he was aware of his assistant's lack of qualifications, then he had a duty to disclose that. That is correct. And as far as his practice of blood spatter analysis... His means Englert here? Englert's practice. I want to stay away from pronouns. Englert's practice, no background in science, does not understand the viscosity of human blood, differences between the viscosity of one human to another human, the difference between an animal blood and human blood. He said that he started practicing by slinging cow blood in his barn. He said for this case that they got a syringe of dog blood  and conducted experiments that were not peer-reviewed. Counsel, I want to ask you. I don't want your time to lapse without asking about your other Brady claim about the sweatshirt DNA. Yes. What exactly is it that was the Brady violation? Is it that they didn't run the test or that they didn't disclose their failure to run the test? What do you claim they should have disclosed? I think it's both. So can I just interject here? If I understood this, and whether this is a Brady claim or not we'll discuss, but instead of saying we didn't run the test, I understood you to be saying they said there's no match, erroneously implying that they did run the test and there was no match, instead of just frankly saying we didn't get around to running it. Is that what happened? That's what happened. That's what the evidence, Mr. McDaniel, the original defense attorney, said. Stan Faith told him we ran it and there was no hit. I understand that. I'm just trying to figure out whether it's how you're framing it as a Brady claim. Because Brady is about disclosure, right? So maybe that was a lie or a fabrication. The district court said, well, the prosecution didn't have it either. Nobody had this evidence, which I think is kind of getting to this point. What did you want them to disclose? They did have the DNA profile and the prosecution was the only entity that had the CODIS system available to them. So that's a state monopoly, so to speak. It was not something defense counsel could go off and do on his own. That is correct. He had to rely on the state. They gave the cellmark DNA profile over to the prosecutor's office and said there is an unknown male and an unknown female DNA on this. Please run this. The response back, according to the original criminal defense attorney, was we ran it and there was no hit. We also know from Faith that he gave four different reasons. But why does that? I understand all that. I understand the facts. But my question is, articulate for me how it fits into Brady as opposed to maybe some other. Well, as far as exculpatory evidence, what we know now is that it would have hit on Charles Bonet. He was an 11-time felon. He had gotten released from the state penitentiary a couple months prior to the murders. Okay. So do we know that it was? I think what Judge Barrett is trying to get you to say is, what's the exculpatory evidence or impeachment evidence in this set of events? Certainly defense counsel has lied to. And maybe if they said, we didn't bother to run it, but that's not exculpatory. That just means we still don't know anything. Is that the truth? And what can a jury believe? Material issue of disputed fact, did they run it and not tell? Did they conceal? So impeachment evidence about one of the investigating officers then, is that it? Or the prosecutor? You haven't alleged that they lied about that, though. You didn't allege that they lied and ran it and knew it was Bonet and didn't disclose it. I thought your complaint was they didn't run it, didn't bother to run it, and then lied and said they had and there were no matches. That's what I thought, too. We don't know what they did. We only know what they told us. We know that when Charles Bonet was arrested, he said, get my lawyer, who was Stan Faith. Stan Faith had represented him twice before. Do we know whether he knew what his nickname was? Because the nickname's on the sweatshirt. Backbone, which is another thing that should have been run through the DOC database, the Department of Corrections. They could have run Backbone and would have popped on Charles Bonet immediately. But do we know that the prosecutor, Faith, was aware of his client's nickname? The only thing that we know, because he denies that, but he testified that he wasn't aware that he could run the nickname through the database at that time. Once again, Mr. McDaniel, the original defense attorney, said, hey, that looks like prison issue. Did you run that nickname through the database? No. Or he said he didn't know he could do it at the time. Okay, I think you need to wrap up at this point. Can I answer your one question that you wanted to know? You may, yes. While Mr. Cam is on bail, he had an ankle bracelet and was on home incarceration. All right, thank you very much. That's helpful. Thank you. Thanks to all counsel. We will take the case under advisement.